## AUSTIN VS. SUPERVISORS OF MILWAUKEE COUNTY.

*Claim of reward offered for arrest of criminal.*

1. Whether a police officer can entitle himself to participate in rewards offered by the government or individuals for the arrest and conviction of criminals, *quære.*
2. In this case plaintiff, after the commission of a murder, and the offer of a reward by defendant for the arrest and conviction of the murderer, gave the police information tending to excite suspicion as to two persons, but without any knowledge of where they then were, or any evidence on which they could be convicted, or which would justify their arrest, and they were afterward arrested and convicted upon evidence procured through the skill and judgment of the police. The jury having found that the plaintiff was not entitled to the reward, *held*, that it was not error to refuse a new trial.

APPEAL from the Circuit Court for *Milwaukee* County.

The plaintiff presented to the board of supervisors of said county a claim for a reward of $500 offered by the the sheriff of the county (duly authorized thereunto by a resolution of said board), "for the arrest and conviction of the person or persons who committed the murder of August Tesch, near the city of Milwaukee, on," etc. The board rejected the claim, having already paid over the reward to the chief of police of the city of Milwaukee. The plaintiff appealed to the circuit court; where a verdict was found against him, a new trial denied, and judgment rendered upon the verdict; from which plaintiff appealed.

The substance of the evidence is stated in the opinion.

*Peter Yates*, for appellant, contended that, upon the facts in evidence, plaintiff was entitled to the reward, and that a police officer could not claim such a reward, citing *City Bank v. Bangs*, 2 Edw. Ch. 95, 105; *Hatch v. Mann*, 15 Wend. 44; R. S. ch. 133, § 64; *Brennan*

*v. Haff*, 1 Hilt. 151 ; *Williams v. Thweatt*, 12 Rich. Law, 478 ; *Kick v. Merry*, 23 Mo. 72 ; 5 Cush. 219 ; 12 Ohio, 281.

*Jenkins & Elliott*, for respondent.

COLE, J. We shall not consider the question, so fully discussed upon the argument, whether a police officer, whose duty it is to be prompt and vigilant in ferreting out crime, and in bringing criminals to justice, should be allowed to participate in public rewards offered for the arrest and conviction of the guilty party. It was claimed and argued by the counsel for the plaintiff, that it would be contrary to public policy, and a violation of well-established legal principles, to permit a ministerial officer, who is sworn to discharge his duty according to the best of his ability, and who, for all his services in the cause of justice, receives a fixed and adequate compensation, to participate in rewards offered either by the government or individuals for the arrest and conviction of criminals. This position is undoubtedly sustained by the following cases : *Pool v. The City of Boston*, 5 Cushing; 219 ; *Gillmore v. Lewis*, 12 Ohio, 281 ; *Kick v. Merry*, 23 Mo. 72 ; *City Bank v. Bangs*, 2 Edwards' Ch. 95. Also, as having more or less bearing upon this question, see *Williams v. Thweatt*, 12 Rich. Law, 478 ; and *Hatch* v. *Mann*, 15 Wend. 44. The real question, however, in this case, is, not whether a police officer may participate in a public reward offered for the arrest and conviction of a criminal, but whether the testimony shows that the plaintiff is entitled to receive it. And, upon the facts disclosed in the bill of exceptions, we think he was not. The material facts upon which the plaintiff relies to establish his right to receive the reward, are briefly these : On Sunday forenoon, the 10th day of November, 1867, upon the railroad leading from the city of Milwaukee to Chicago, a young man, by the name of August Tesch, was murdered. The sheriff, acting in behalf of Milwaukee county, immediately offered a re-

ward of $500 for the *arrest and conviction* of the person or persons who committed the murder. Two strangers had been seen in the vicinity of the murder, at about the time it was committed, by three or four persons. From these persons the police directly obtained a description of the size, age and dress of these strangers, and learned that they had gone westward; but their names and residence could not be ascertained. Aside, however, from the fact that these strangers were seen in the neighborhood where, and about the hour, the murder was committed, there was really no circumstance which tended to fasten the crime upon them. These two strangers were likewise seen by the son of the plaintiff, and one Hamilton, a schoolmaster, on the forenoon of the 10th; the former meeting them about two miles west, and the latter about a mile and a half west, of the place of the murder. Hamilton knew one of these men, recognized and conversed with him; and, according to the sworn statement made and presented to the board of supervisors, it appears that, on the Tuesday evening following, Hamilton informed the plaintiff of their names. In his testimony on the trial, the plaintiff states that Hamilton did not inform him that he knew these men until after he had seen one Gumber, and got a description of them from him, which was some time the last of January or in February following. It appears that Hamilton boarded with the plaintiff that winter, and that the subject of the murder was a frequent topic of conversation in the family; and from the entire harmony in the description of the size, dress, etc., of the men, given by the plaintiff's son and Hamilton in these conversations, the plaintiff says he became satisfied, and so expressed himself, that these two men thus seen were the murderers of young Tesch. He says that he tried to induce Hamilton to go and tell the police all he knew about the men; but the latter declined doing so, either because he was afraid of getting into difficulty, or because he believed the men to

be innocent of this crime. Finally, some time in February, the plaintiff saw in Milwaukee the chief of the police, and either himself told him the names of these men, or informed him that Hamilton knew them, and where Hamilton was to be found. The police officers then saw Hamilton, and learned what he knew about the men. Following up this information, the police officers traced one of the men, whose name was Reed, to Rock county. Mr. Beck [then chief of police in Milwaukee] says, that he sent a person whose appearance would not excite suspicion, to Milton, to inquire where Reed was, and about his comrades. This person was gone three days, and came back and reported that Reed was at Clinton Junction, and "had been arrested for pounding his wife;" that a man by the name of Craig, who used to be a chum of his, was a witness against him; and that there was another hard-looking fellow there, by the name of Howard. Mr. Beck then went himself to Clinton Junction, saw Craig, and became satisfied that there would be no use of arresting him, that they had no evidence against him, and that he would not confess any thing, but concluded that, "*because Reed had been arrested for pounding his wife, he was a coward, and that he might own up.*" So the chief of police, acting thus upon his clear insight into human character, and his ability to distinguish the adroit and self-possessed villain from the nervous and timid culprit, and also upon other facts in respect to Reed which had come to his knowledge, caused Reed to be arrested. Reed at once made a full confession of the murder, declared who his confederate was, and, by means of this information, Howard, the other murderer, was afterward arrested in Minnesota, and both were tried and convicted of the crime. Now, upon these facts, can it fairly be said that the plaintiff furnished the information which not only led to the discovery and detection of the criminals, but likewise secured their conviction? It appears to us not. At most, all that the plaintiff could or did do was to

furnish the police officers with the names of two suspicious persons, who had been seen in the vicinity when and where the crime was committed. But where were these men in February, when the plaintiff saw Mr. Beck, and what testimony could he produce which would criminate them? He neither knew where they were, nor did he furnish the least particle of evidence which would tend to convict them when found. For the bare facts, that they had been seen in the neighborhood on the morning of the murder, and were inquiring the way to Milwaukee while in sight of the city, were "trifles light as air." They afford, of themselves, no proof of guilt. These facts merely showed that these men were, at the time, where they possibly might have committed the crime. The same thing might have been said of hundreds of others. The reward was for the arrest and conviction of the perpetrators of the crime. The plaintiff certainly had no knowledge of any fact that would secure a conviction. He took no risk upon himself in the matter; made no efforts to obtain further information in respect to these suspicious persons, or confirm his impressions about them; and the authors of the crime would have forever remained a mystery for any thing he did, or any knowledge he could impart to the officers. And it was only by the exertions and skill of experienced detectives, acting upon the clue furnished by the plaintiff, that they were finally discovered and brought to justice. Even when the officers found where one of these suspected persons was, they had no evidence against him which would justify an arrest. But an able and discriminating detective, guided by his accurate knowledge of the character and disposition of criminals, assumed the responsibility of making an arrest, in the hope that a cowardly felon "might own up." The experiment succeeded, and a confession by one of the actors in the bloody drama furnished really the means of information which led to the discovery and conviction of the murderers.

We therefore think the circuit court very properly denied the motion for a new trial.

*By the Court.* — Judgment affirmed.